271 So.2d 7 (1972)
Annabelle G. BELCHER, Petitioner,
v.
John A. BELCHER, Respondent.
No. 42023.
Supreme Court of Florida.
August 23, 1972.
Rehearing Denied December 15, 1972.
*8 Carr & Warren, Miami, for petitioner.
Horton, Schwartz & Perse and Milton M. Ferrell, Miami, for respondent.
DEKLE, Justice.
We reach here yet another milepost on the "antenuptial" trail over which a journey was rather recently begun with the classic *9 Del Vecchio[1] and thereafter propelled periodically in a perceptive progression of pedagogic pronouncements pertaining to preeminent progeny, Posner, Lindsay and others.[2] Conflict is asserted between the Third District's holding at 256 So.2d 75 and these earlier mileposts and also with Astor[3] and Contractors Contract Noy 5948,[4] regarding a husband's basic obligation to provide support. Jurisdiction vests under Fla. Const. art. V, § 4(2), F.S.A.
The query here is an extension of the questions posed on earlier legs of our journey; we are now asked whether or not by express provision in an antenuptial agreement the husband can, by the payment of a present, fixed consideration, contract away his future obligation to pay alimony, suit money and attorney's fees during a separation prior to dissolution of the marriage. This is the sole determination here. Previously this Court in the above-mentioned cases has held, and now reiterates, that antenuptial agreements in Florida are valid and binding in accordance with the criteria set forth in Del Vecchio and Posner as to full disclosure, fair and reasonable provisions for support and valid consideration. However, we now hold further that before and pending dissolution of the marriage a husband's obligation of support while still married continues under the historical principle supported by an unbroken line of cases since shortly after Florida became a state in 1845[5] which we decline to reverse, as would be necessary in order to accept the husband's contention here that his agreement extends as controlling to the period while his marriage continues. This provision of such an agreement is a factor to be considered but not the sole factor, nor conclusive, in a determination of support pendente lite.
For temporary support, suit money and temporary attorney's fees, the State remains an interested party and cannot be excluded by contract during this period of continuance of the legal relationship of husband and wife. Contracts are made in legal contemplation of existing, applicable statutes[6] and so it is that marriage contracts[7] and any ante or post-nuptial contracts are entered into subject to then existing law, including the law of this state that makes a husband responsible for the support of his wife while she is married to him.
We recall with approval Mr. Justice Roberts' (now Chief Justice) initial premise in Posner I: (233 So.2d p. 382)
"At the outset we must recognize that there is a vast difference between a contract made in the market place and one relating to the institution of marriage."
This suit is for "alimony unconnected with divorce" (dissolution) under Fla. Stat. § 61.09 (1969).[8] Neither party has asked for a divorce. We do not have present here those problems presented in earlier cases dealing with initial disproportionate *10 provisions for the wife, failure to make full disclosure, overreaching or fraud. We simply have the query: "Can the husband CONCLUSIVELY `buy out' of his admitted obligation to support a wife prior to divorce by an advance agreement?" It must depend upon the factual situation. If the wife is adequately cared for by her own income and assets (including any then remaining assets or income to her as earlier consideration in the antenuptial agreement) then, just as in non-antenuptial cases, the husband need not provide temporary alimony. Similarly, suit money and attorney's fees turn on the wife's relative ability at the time of suit. Raley v. Raley, 50 So.2d 870, 872 (Fla. 1951); former Fla. Stat. § 61.09 now § 61.16, F.S.A.
The measure of adequate care is the historical need of the wife, ability of the husband to pay and their standard of living.[9] The husband cannot cut her adrift without further obligation when he pleases, if "when he pleases," her circumstances during coverture while they remain man and wife are such, despite earlier considerations paid (though this is a factor), she is not at this critical time of separation before any dissolution of marriage, adequately cared for, consistent with her needs, their standard of living[10] and his ability to pay at this time. These criteria may substantially differ between the date of the antenuptial agreement and the time for its application at separation. Thus in attempting to "settle in advance" a continuing marital obligation, the husband must remain subject to his legal obligation while still married. The State still imposes upon marriage contracts the obligation that the wife shall not become dependent upon welfare or others; it requires that an able husband support a needy wife during coverture.[11] To be borne in mind is the basic fact that the parties are still husband and wife which remains the predicate for support of the wife by the husband so long as they are still married.
Provision for "permanent" settlement after dissoluion of the marriage is another matter; fair provisions thereon will be recognized as a matter of contract; indeed post-nuptial settlement agreements are regularly approved upon meeting proper requirements of disclosure and fairness. The contract here is skillfully drawn and has studiously provided by its terms for the eventualities after court dissolution or upon dissolution by death as to the husband's estate. The Belcher contract, however, then attempts to go one step further than the Posner contract, which only purported to apply "after divorce" (despite the inadvertent reference in the district court's certified question to "separation or divorce"). The Belcher agreement seeks to apply its provisions as to considerations paid, to "be also accepted" by the wife in advance "in lieu of any and all claims which may or could be made by her against First Party (husband) for alimony, suit money or other maintenance during the lifetime of First Party; and Second Party (wife) hereby waives, renounces and relinquishes" any and all such claims against him. This we hold cannot be conclusively done for the period prior to dissolution. The contract provisions in this additional respect during the separation, are to be given consideration but are to be considered together with all other pertinent conditions of need, ability to pay and the current standard of living of the parties at the time of the hearing for support during the separation, until any later dissolution of the marriage. From all of the evidence on this aspect of the case, the chancellor would then determine, as in cases without such an agreement, what, if any, additional support, suit money and attorney's fees should be awarded to the wife.
This holding does not affect the validity of the antenuptial contract in its other respects, *11 in which it is tested under Del Vecchio and Posner. It is upon the dissolution of the marriage, by divorce or death, that these other classic provisions regarding dower, property, estate and permanent alimony are thereby invoked.
Until there is a decree of dissolution of the marriage, thus ending her role as wife, the wife's support remains within long-established guidelines of support by the husband which cannot be conclusively supplanted by his advance summary disposition by agreement.
Petitioner and respondent were married on January 20, 1970; on May 11, 1971, respondent informed her that he no longer wanted the responsibility of marriage and ordered her to pack her belongings and remove herself from the marital home. Then, apparently realizing that the home was one of the assets he had given to her as the consideration in their antenuptial agreement, moved out himself. It is alleged that respondent has assets in excess of $3 million. The husband responds by asserting the antenuptial agreement as a complete defense to any demand for temporary alimony, suit money and attorney's fees.
The learned chancellor noted that what he was awarding was alimony pendente lite, suit money and attorney's fees in an "action for separate maintenance." After correctly ruling that the husband had a duty to support his wife during their marriage after separation, notwithstanding the antenuptial agreement, the chancellor conducted a limited hearing to determine her needs and his ability to pay. At the hearing, the wife presented a statement of estimated needs and the husband submitted evidence of his actual worth. In determining the amount of reasonable living expenses for the wife, the chancellor kept the status quo: the husband must continue to support his wife during coverture by paying generally the same expenses (omitting long range and vacation items) and by paying amounts he had been providing prior to their separation  not unlike similar orders over the years in separation. From these two orders interlocutory appeals were taken to the Third District, reversed and this certiorari followed.
The historical balance of "need and ability" remains as the formula in determining alimony during coverture. This principle is repeatedly cited in the authorities as the basis for alimony, support and attorney's fees to the wife from a husband more able to pay; it continues to undergird support provisions despite the present changes in our divorce laws (now "dissolution of marriage").[12] It would be inequitable to deny a needy wife support from an able husband by reason of an earlier provision in an antenuptial agreement, thereby leaving her "the ward of the state" or dependent upon others or simply deprived.
Under this settled formula, we have reviewed the record before us and it indicates that the chancellor's evidentiary hearing on temporary allowances did not explore all essential elements in determining need and ability, as should be done. The chancellor's order for the hearing limited the inquiry (and objections at the hearing consistent with that limitation were sustained) to "testimony upon plaintiff's application for temporary relief ... confined to the question of reasonable living expenses of the wife and the husband's ability to pay." This restrictive probe necessarily omitted an essenial ingredient: her ability to earn and the appropriateness or not at this time of the wife working in the light of their standard of living. This additional proof may or may not change the chancellor's present findings with respect to the need and ability equation but the determination should be made.
The statement in her brief (filed in the district court) that "The appellee has no independent income other than what is produced *12 by her capital assets" is not supported by the record before us. The chancellor simply did not fully explore this situation; e.g., no answer was allowed as to whether or not the wife worked prior to her marriage which would bear directly upon her present earning capacity. These are appropriate inquiries to be made in a full exploration of ability and need for which the cause must be returned for that consideration before the trial court.
Under the agreement signed by the wife prior to the ceremony on the day of her marriage, she received capital assets consisting of the home, stocks and insurance totaling approximately $200,000. The husband rends his double knit garments in perplexed agitation that the wife should be permitted to accept the $200,000 fruits of her agreement (a home, stocks and insurance if he dies) and then to impeach the implicit terms of an agreement stating that he should not be compelled to comply with support upon separation, out of his remaining $3 million. To him she seems to be saying at this later time, "Yeah, but what have you done for me LATELY?" Perhaps a husband must consider (notwithstanding today's "women's lib" for extended "equal" rights for women) that classic observation of Lord Byron in his Pearls of Wisdom: "Women are made to be loved  not to be understood." Someone has said, "We call them `the opposite sex' because just when you think you've fooled her, it's just the opposite!"
Respondent argues that "in lieu of his obligation to support" (which are the words of the contract) he has settled substantial assets upon her IN ADVANCE, as listed in the agreement. The question then is: Can he accomplish such a "washout" advance settlement for any obligation of support while the marriage continues? Can he do this at the beginning of the marriage "when the caresses are tender in the Spring," and then walk away when Winter comes and the fires glow lower? Perhaps he can, if the wood he earlier piled by the door (with what was already there) is still sufficient to keep her warm with the glow he has established as their standard. On the other hand, if the woodpile has run lower at that point (her assets) equity still requires that he maintain her at a reasonable level while still married and at that "glow" which he had established for them during the period of their marriage, within his then ability.[13] It is one thing to settle on permanent property interests, dower and rights in an estate for the future after the marriage is dissolved; it is another to make a fixed advance determination of support at least during coverture. (We do not have before us the question of permanent alimony after dissolution.) The requirement for support of a wife, so long as she has the legal status of wife, must still be based on equitable principles of need and ability.
Gates v. Foley[14] presents a learned analysis by Adkins, J., of married women's separate property rights as enhanced by the recent expansion of the law and changes in the Florida Constitution to insure equal rights to women. Justice Adkins' reference to the giving way of the "unity concept of marriage" to a position of "an equal to her husband" is in the context of property rights and third party relationships. Foley expressly recognized the "loss to the wife of her husband's material support" (247 So.2d p. 45). This keeps intact the wife's right during continuation of their marriage to support from a husband which we reaffirm here.
We must distinguish a "waiver" by the wife upon adequate consideration under an antenuptial agreement, of dower, inheritance or other claims against the estate of the husband,[15] (which meet the standards of fairness and full disclosure); and the "waiver" claimed sub judice of all "alimony, suit money or other maintenance during the lifetime of the husband" at any *13 future time while the parties remain married. The latter cannot be done arbitrarily, with finality and without judicial review.
The district court in holding to the contrary relies upon our original opinion in Posner I by saying:
"In Posner v. Posner, Fla. 1970, 233 So.2d 381, the Supreme Court rejected a contention that an antenuptial agreement by which a prospective wife waives or limits her rights to alimony in the event of divorce or separation is against public policy and void. In that case, in which an antenuptial agreement had made provision for only a limited amount of alimony, the court held that the agreement was valid and binding between the parties, `but subject to be increased or decreased under changed conditions as provided for in § 61.14, Florida Statutes, F.S.A.' The decision in that case denotes the validity of the agreement of the wife with relation to alimony in the present case." (emphasis ours)
This reliance upon Posner I is misplaced; it is a misapplication of the law.[16]Posner I considered a certified question from the Third District Court of Appeal. The question of great public interest concerned the validity of an antenuptial agreement "specifying an amount of alimony."[17]Posner I did not involve a "waiver" of all rights of alimony. Precisely, the Posners' agreement limited alimony to $600 per month. On these facts, Posner I holds, upon the satisfaction of certain conditions,[18] that antenuptial agreements limiting alimony to a certain amount are enforceable (and subject to modification as held in Posner II). The provision in the Belchers' antenuptial agreement does not limit alimony to a specific sum; it waives ALL rights to alimony (there could be no modifification of NONE). Thus Belchers' waiver provision poses a different and divergent issue not decided in Posner I: Whether a husband can by antenuptial agreement waive his entire obligation to support his wife while the marriage relationship continues. Notwithstanding this material distinction, the district court said, as quoted above, Posner I upholds antenuptial agreements waiving ALL rights to alimony. Clearly, the district court has attributed to Posner I a principle of law not based upon the factual circumstances in that case. Posner I should not have been cited as controlling precedent in this matter.
It boils down then to this: "What is the situation of the parties at the time of the relief sought?" The relief sought at this point is temporary alimony and attorney's fees in an action only for a legal separation. Such relief for a period when the parties are still man and wife cannot be absolutely determinable solely by the prior provision of waiver of any such relief nor thereby arbitrarily precluded. It would be an inconsistency, on the one hand to allow an increase or decrease as circumstances showed upon application for relief by virtue of a limited amount of alimony provided in an antenuptial agreement (Posner); yet preclude a showing even being made as to present need or adequacy where the provision had been for fixed assets or amounts as here. We cannot approve such an inequitable result.
In its conclusion, the district opinion asserts the proposition (which it states that it "denotes" from Posner) that the wife here, having accepted the initial benefits, cannot be considered for any award of temporary alimony because "not based on any necessity claimed to have arisen from changes of financial circumstances of the parties." This reference to "changed circumstances" was set forth in the two Posners, but it was an additional factor and *14 not the basis for the holdings. Nor was it made the predicate, as the district opinion made it, for the invalidity of a waiver of all alimony. It is not essential to a consideration by judicial review of alimony before dissolution, that there must be a showing of changed circumstances since the lump sum antenuptial agreement. It is the total circumstances of the parties (again "ability and need" and standard of living) at this later time of application for alimony pendente lite to which we look during their continued marriage relationship.
Consider for a moment, that the $200,000 initially given to the wife has now been spent (or in great part) and the husband's ability is still at the $3 million level. Should the wife be precluded from temporary support and assistance in pursuing her rights simply because the husband has remained the same millionaire that he was at the time of the antenuptial agreement with no change of circumstances and she has had to spend some or all of the consideration initially given her and does not have other sufficient means? We must look to the equities as they exist, as in any other equity case.
We do not understand why the able Third District chose not to follow its own fine decision in Lindsay v. Lindsay, 163 So.2d 336 (Fla.App.3d 1964), wherein Judge Norman Hendry in a scholarly analysis points us in the right direction. The eminent Judge first correctly analyzes Del Vecchio which upholds a contract as to dower, and then points out that while Del Vecchio by implication holds that the parties may contractually determine alimony provisions (as Posner I came to recognize where monthly support payments are provided in the agreement) Del Veccio does not decide for us the question of the validity or sole binding effect of an antenuptial agreement wherein the future wife waives all right to alimony, support and attorney's fees. (The contention of an absence of consideration in Lindsay does not distract from the basic principle involved.)
The district court sought to distinguish the principles involved in the present claim which is solely for alimony unconnected with divorce and one which is for "divorce", referring to Lindsay. This distinction does not differentiate the two cases on the matter of temporary relief. The nature of the action does not control; it is the relief sought in either action with which we are concerned. In Lindsay the wife filed for divorce and temporary alimony. The latter claim for temporary support necessarily encompasses support during the separation period prior to divorce, and is no different in relief sought than the temporary support in the action for legal separation here. In both instances, the petitioner occupies at the time of application the status of a wife, entitled to support by virtue of that marital status.
The Lindsay decision was from the trial court's interlocutory ruling on the wife's request for temporary alimony; it dealt with the husband's obligation to support after separation but before divorce. Our case presents the same question concerning temporary alimony as does Lindsay. In such similar situations, the principles are the same, which makes the rationale in Lindsay applicable here despite the contention that there was no consideration there. The principle is the same.
Lindsay states it plainly: (163 So.2d p. 337)
"The husband may not completely relieve himself of his obligation to support his wife." (while she remains his legal wife) (emphasis and parenthesis added)
Lindsay then recites some very pertinent authorities on the subject from our sister states, including Stratton v. Wilson, 170 Ky. 61, 185 S.W. 522 (1916), holding such a complete waiver of alimony to be void; likewise Garlock v. Garlock, 279 N.Y. 337, 18 N.E.2d 521, 120 A.L.R. 1331 (1939), prohibiting a husband from relieving himself completely of his obligation to support his wife, again referring to that period before she ceases to be his wife upon dissolution of *15 the marriage. The New York statute's prohibition of such contracts, the Garlock Court said, is "merely a codification of the long-established common law" to support a wife during marriage.
A further case on this point which Lindsay appropriately quotes (163 So.2d p. 338) is from the Supreme Court of Wisconsin, Ryan v. Dockery, 134 Wis. 431, 114 N.W. 820, 821, 15 L.R.A.,N.S., 491 (1908), ruling:
"The law requires a husband to support, care for, and provide comforts for his wife in sickness, as well as in health. This requirement is grounded upon principles of public policy. The husband cannot shirk it, even by contract with his wife, because the public welfare requires that society be thus protected so far as possible from the burden of supporting those of its members who are not ordinarily expected to be wage earners, but may still be performing some of the most important duties pertaining to the social order. Husband and wife may contract with each other before marriage as to their mutual property rights, but they cannot vary the personal duties and obligations to each other which result from the marriage contract itself." (during pendency of the marriage) (emphasis and parenthesis added)
Lindsay then concludes:
"It is therefore obvious that although the wife may contract away dower rights, she may not in an ante-nuptial agreement, do the same with regard to support.[3] (during the marriage)
"[3] Motley v. Motley, 255 N.C. 190, 120 S.E.2d 422 (1961); Note, 54 Harvard L. Rev. 473 (1941)." (parenthesis ours)
Certiorari is accordingly granted; the Third District's opinion is hereby quashed with directions to remand the cause to the trial court for further consideration, reassessment and proceedings not inconsistent with this opinion.
It is so ordered.
ERVIN, BOYD and McCAIN, JJ., concur.
ROBERTS, C.J., concurs with judgment with special opinion.
CARLTON, J., dissents with opinion.
ADKINS, J., dissents and concurs with CARLTON, J.
ROBERTS, Chief Justice (concurring specially).
I concur in the judgment. However, during the relatively brief period of sixteen months that the parties lived together the wife has received capital assets consisting of the home, stocks, and insurance totaling approximately $200,000. This should certainly weigh heavily on the discretion of the chancellor in awarding further benefits. For further discussion see Kahn v. Kahn, 78 So.2d 367, in which this court said among other things:
"Since its original enactment in 1828, our statute has authorized the Chancellor to make such allowance for alimony to the wife `as from the circumstances of the parties and nature of the case may be fit, equitable and just; * * *.' Section 65.08, Fla. Stat., F.S.A. The wife's need and the husband's ability to pay was at an early date established as the criterion by which to determine what alimony, if any, was to be awarded the wife. See Jacobs v. Jacobs, Fla. 1951, 50 So.2d 169, and cases there cited. Thus, there was no need for alimony on the part of the wife if she had a separate estate `adequate to her comfortable support.' Chaires v. Chaires, 1864, 10 Fla. 308, 315, citing Bright, on Husband and Wife, p. 359. Ordinarily, however, in those days the husband was the `only hope of support' of an `unfortunate wife, who may have been abandoned by a dissolute husband and doomed to drag out a weary existence in married widowhood. * * *' Chaires *16 v. Chaires, supra. And, indeed, until recent years, a divorced wife had little prospect of being able to work and earn a livelihood, and it was essential to a well-ordered society that she be appropriately maintained by her estranged husband so that she would not become a charge on the community. Times have now changed. The broad, practically unlimited opportunities for women in the business world of today are a matter of common knowledge. Thus, in an era where the opportunities for self-support by the wife are so abundant, the fact that the marriage has been brought to an end because of the fault of the husband does not necessarily entitle the wife to be forever supported by a former husband who has little, if any, more economic advantages than she has. We do not construe the marriage status, once achieved, as conferring on the former wife of a shipwrecked marriage the right to live a life of veritable ease with no effort and little incentive on her part to apply such talent as she may possess to making her own way. The matter still rests  as it has since 1828  in the discretion of the Chancellor to make such an award for alimony as `from the circumstances of the parties and nature of the case may be fit, equitable and just.'" (e.s.)
CARLTON, Justice (dissenting):
I must respectfully dissent from the majority opinion filed August 23, 1972, and would, therefore, grant rehearing to respondent in this cause.
On the 20th day of Jan. 1970, petitioner and respondent entered into an antenuptial agreement whereby petitioner received fee simple title by warranty deed to a $52,000 home in Bay Point, a subdivision in Miami; $16,000 in cash; an insurance policy on the life of respondent in the sum of $50,000, payable to petitioner with petitioner as the irrevocable beneficiary, and under agreement that respondent would pay the premiums; approximately $100,000 in stocks and securities; an additional insurance policy to be obtained in the sum of $50,000 on the life of respondent with petitioner as the irrevocable beneficiary. This agreement specifically included a provision that the petitioner was familiar with the assets of respondent stated to be approximately Three Million ($3,000,000) Dollars. In return for these considerations, petitioner contractually agreed to accept the same "... in lieu of any and all dower or rights of dower, and in lieu of any and all rights of inheritance, and in lieu of any and all other claims and demands which otherwise but for this Agreement could be claimed or asserted by Second Party in or to the estate and property of First Party, either before, at or after the death of First Party, and the provisions herein provided to be made to Second Party are and shall be also accepted by Second Party in lieu of any and all claims which may or could be made by her against First Party for alimony, suit money or other maintenance during the lifetime of First Party; and Second Party hereby waives, renounces and relinquishes any and all rights of dower, inheritance, and other claims or demands of every kind and character which she might or could but for this agreement claim or assert against First Party or in or to the estate of First Party in the event he shall predecease Second Party.", as provided in Paragraph 4 of the Agreement.
The parties were married on January 20, 1970, and separated on May 15, 1971, whereupon petitioner brought this present action for temporary alimony, suit money and attorney's fees. Petitioner did not contest the validity of the antenuptial agreement as a whole, but merely questioned the validity of the above-quoted paragraph 4 as it pertained to a waiver of alimony and other maintenance during marriage.
The trial court held that this provision of the agreement would not preclude the wife from receiving temporary alimony or suit money. I emphatically concur with the decision of the Third District Court of Appeal which reversed the trial court and held that the contested provision of the *17 antenuptial agreement was unambiguous and definite, that there is no underlying reason of public policy, or otherwise, to grant the wife temporary alimony and suit money to aid her in prosecuting an action for alimony which, by her agreement, she was not entitled to claim, and that the agreement of petitioner with relation to alimony in the present case was valid.
I discern no distinction between a "waiver" by the wife upon adequate consideration under an antenuptial agreement, of dower, inheritance or other claims against the estate of the husband, as well as for permanent alimony after divorce which meets the standards as have been expressed by this Court in Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla. 1962) of fairness and full disclosure; and the waiver claimed in the instant case of all alimony, suit money, or other maintenance during the lifetime of the husband.
Here, the parties in an arm's length transaction contracted to eliminate the wife's right to alimony and petitioner willingly accepted all of the benefits of the contract.
Since 1943 and the promulgation of the Married Woman's Emancipation Act, a married woman may enter into agreements and contracts with her husband. Florida Statutes, Section 708.09, F.S.A. This statutory provision includes the execution of antenuptial agreements. In the decision of Weeks v. Weeks, 143 Fla. 686, 197 So. 393, this Court cited with approval Murdock v. Murdock, 219 Ill. 123, 128, 76 N.E. 57, 59 (1905) and quoted therefrom the rule that a man and woman who contemplate marriage may by an antenuptial contract, if there is full knowledge on the part of the intended wife of all that materially affects the agreement, settle their property rights in each other's estate. Referring to antenuptial agreements, this Court explicated in Del Vecchio v. Del Vecchio, supra, 143 So.2d at 20:
"Inasmuch as such agreements are in harmony with the public policy and often conducive to marital tranquility, it seems necessary that we now re-examine the rule and express our views with more particularity."
An argument of public policy has been employed by the majority to conjure up an artificial distinction between waiver of alimony during marriage and waiver of alimony after divorce. No such distinction is justified. In Del Vecchio v. Del Vecchio, supra, this Court set several standards for determining the validity of an antenuptial agreement, none of which included a differentiation between a contractual agreement to settle property rights during marriage and one to settle such rights after a marriage has been dissolved. Therein, this Court opined:
"(1) A valid antenuptial agreement contemplates a fair and reasonable provision therein for the wife, or, absent such provision, a full and frank disclosure to the wife, before the signing of the agreement, of the husband's worth, or, absent such disclosure, a general and approximate knowledge by her of the prospective husband's property. The term `approximate' is, for this purpose, held synonymous with `near,' `close to' or `approaching.'
"If the provision made by the agreement is not fair and reasonable then it should be made to appear that the wife, when she signed, had some understanding of her rights to be waived by the agreement. In any event she must have signed freely and voluntarily, preferable, but not necessarily a required pre-requisite, upon competent and independent advice.
"(2, 3) Inadequacy of provision for the wife does not in itself vitiate an antenuptial agreement. If, when she signed the contract freely and voluntarily, she had some understanding of her rights and had been fully informed by the husband as to his property or if, notwithstanding the husband's failure to disclose, she had or reasonably should have had a general and approximate knowledge of the character and extent of his property she will be bound."
*18 The right to contract is fundamental and is one of the most valuable rights of a citizen. State ex rel. Fulton v. Ives, 123 Fla. 401, 17 So. 394 (1936). Continuing strides in the area of women's rights, particularly in this area of right to contract, have been made since the Married Woman's Emancipation Act of 1943.
Article XI of the 1885 Constitution of Florida has been replaced by Article X, Section 5 (1968 Constitution of Florida), F.S.A., which provides that there shall be no distinction between married women and married men in the holding, control, disposition or encumbering of property, both real and personal, except that dower or curtesy may be established and regulated by law.
As Justice Adkins readily recognized in Gates v. Foley, 247 So.2d 40 (Fla. 1971), "The recent changes in the legal and societal status of women in our society forces us to recognize a change ..."
Properly applicable to the instant factual situation and my conclusion that a wife may contract away her alimony during marriage, so long as the agreement is valid when tested by the stringent rules of Del Vecchio v. Del Vecchio, supra, is the further statement expressed by Justice Adkins in Foley v. Gates, supra, that,
"So it is that the unity concept of marriage has in a large part given way to the partner concept whereby a married woman stands as an equal to her husband in the eyes of the law."
and the statement contained therein, that
"The law is not static. It must keep pace with changes in our society, for the doctrine of stare decisis is not an iron mold which can never be changed."
Being unable to find any rational distinction between a validly entered into antenuptial agreement waiving alimony subsequent to marriage which agreements have been upheld by this Court, and a validly entered into agreement which contains a paragraph providing for waiver of alimony before consummation of dissolution of the marriage, I must respectfully dissent.
I would grant rehearing and would agree with the decision of the Third District Court of Appeal finding the antenuptial agreement in issue to be a validly enforceable contract.
ADKINS, J., concurs.
NOTES
[1] Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla. 1962).
[2] Posner v. Posner, 233 So.2d 381 (Fla. 1970); Posner v. Posner, 257 So.2d 530 (Fla. 1972); Posner v. Posner, 237 So.2d 186 (Fla.App.3d 1970); Lindsay v. Lindsay, 163 So.2d 336 (Fla.App.3d 1964); Cantor v. Palmer, 166 So.2d 466 (Fla. App.3d 1964), cert. denied 168 So.2d 144 (Fla. 1964); McMullen v. McMullen, 185 So.2d 191 (Fla.App.2d 1966); and Fern v. Fern, 207 So.2d 291 (Fla.App.3d 1968).
[3] Astor v. Astor, 89 So.2d 645 (Fla. 1956).
[4] Contractors Contract Noy 5948 v. Morris, 154 Fla. 497, 18 So.2d 247 (Fla. 1944).
[5] Ponder, Executor v. Graham, 4 Fla. 23, 30 (1851); Thompson v. Thompson, 86 Fla. 515, 98 So. 589 (1923); Hagen v. Viney, 124 Fla. 747, 169 So. 391 (1936); Astor v. Astor, 89 So.2d 645 (Fla. 1956).
[6] H.B. Holding Co. v. Girtman, 96 So.2d 781, 783 (Fla. 1957); Fry v. Hawley, 4 Fla. 258, 263-64 (1851).
[7] Underwood v. Underwood, 64 So.2d 281, 288 (Fla. 1953).
[8] This suit will proceed as to relief sought by petitioner under the old law. See new § 61.191.
[9] Kaufman v. Kaufman, 63 So.2d 196 (Fla. 1953), and Guilden v. Guilden, 104 So.2d 737 (Fla.App.3d 1958).
[10] Id.
[11] See footnotes 3 and 4.
[12] Fla. Stat. Ch. 61 (1971), F.S.A.
[13] See footnote 9.
[14] 247 So.2d 40 (Fla. 1971).
[15] Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla. 1962).
[16] This misapplication establishes another ground for our jurisdiction. Spivey v. Battaglia, 258 So.2d 815 (Fla. 1972); McBurnette v. Playground Equipment Corp., 137 So.2d 563 (Fla. 1962); and Pinkerton-Hays Lumber Co. v. Pope, 127 So.2d 441 (Fla. 1961).
[17] 257 So.2d 530, 532 (Fla. 1972).
[18] 233 So.2d 381, 385 (Fla. 1970).